UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RENEE CROTHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:25-CV-00647-AGF |
| | ) | |
| SODEXO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Sodexo, Inc.'s ("Sodexo") motion (ECF No. 35) for summary judgment on Plaintiff Renee Crothers's claim asserting retaliation in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010-213.137. For the following reasons, the Court will grant Sodexo's motion.

**BACKGROUND**

Viewed in the light most favorable to Crothers for the purpose of Sodexo's motion for summary judgment, the record establishes the following facts. Sodexo provides janitorial, maintenance, and security services to its client, Proctor & Gamble ("P&G"), at P&G's facility in St. Louis, Missouri. ECF No. 37 at 1. The relationship between Sodexo and P&G is governed by a Master Services Agreement ("MSA") and site-specific agreements. *Id*. Sodexo hired Crothers, a female, as an hourly Environmental Services ("EVS") Supervisor on or about May 16, 2022. *Id*. While employed by Sodexo, Crothers worked at P&G's St. Louis facility. *Id.* at 2.

**Sodexo Employee Complaints About Crothers**

On or about October 16, 2023, one of the employees Crothers supervised, John Eiland, filed a formal complaint with Sodexo's human resources department, also known as the "People Center," stating that Crothers was bullying him, threatening him with unwarranted discipline, and otherwise making him feel uncomfortable. ECF No. 43-1. Sodexo's documentation shows that this complaint was investigated by a human resources specialist, Anthony Fronczak, and the investigation was closed with the status of "resolved" two days later, on October 18, 2023. *Id.* There is no evidence indicating that any of the decisionmakers involved in Crothers's ultimate termination were aware of this October 2023 complaint at the time it was made or at the time of Crothers's termination. Crothers was not disciplined for this complaint, and Crothers alleges that she did not learn of this complaint until after she was terminated.

In November of 2023, Sodexo's then-Executive Director overseeing its operations at the St. Louis P&G site, Rosendo Arana, received a report that Crothers was in the bathroom cursing while talking about another employee, and the reporting employee recorded Crothers's cursing and played it for Arana. ECF No. 43-4, Arana Dep. 58:22-60:21. Arana contacted Sodexo's human resources department to determine whether the recording was unlawful, and believed it was unlawful, but did not discipline the employee for making the recording. *Id.* at 61:15-62:14. The employee did not make a formal complaint against Crothers, Crothers was not disciplined for this incident, and Crothers alleges that she did not learn of this complaint until the time of Arana's deposition in this litigation. ECF No. 43 at 3-4.

On or about November 28, 2023, two maintenance employees (painters) complained that Crothers called them both "stupid mother fuckers." *Id.* at 4. Arana opened a case for these complaints to be investigated by Sodexo's human resources department. *Id.* The investigation concluded in a recommendation that Crothers receive written coaching. *Id.* at 5.

On December 18, 2023, Arana emailed Sodexo's human resources department informing them that one of Crothers's subordinate employees, Eiland, reported to Arana that Crothers threatened to fire him (Eiland) and yelled at him via text message, and Arana attached to the email a copy of the text messages in question. ECF No. 43-4, Arana Dep. 138:21-140:24. In these text messages, it appeared that Eiland labeled Crothers's contact in his cell phone as "Sodexo Supervisor Bitch." *Id.* at 91:7-17. Arana reviewed the text messages, determined that Crothers should not be disciplined, and told Crothers that he was "not extremely worried" about the texts but to "tone it down a little bit." *Id.* 87:3-7; 140:16-19. Eiland was not disciplined for referring to Crothers as "Sodexo Supervisor Bitch." *Id.* at 91:7-17.

Also on or about December 18, 2023, Michael Emmerich ("Emmerich") began working as the new Director of Facilities Operations ("DFO") for Sodexo at the P&G site and became Crothers's direct manager. ECF No. 43 at 7.

The next day, December 19, 2023, Arana and Emmerich delivered to Crothers the written coaching relating to the report that Crothers called the painters "stupid motherfuckers." *Id.* at 7-8; *see also* ECF No. 37-7, Def.'s Ex. G. The written coaching, signed by Sodexo Vice President, Nathan Wagner, described the allegation against

Crothers and stated that "[a]n employee making any type of derogatory remarks about other employees brings the cohesion of the team down . . . [and] causes a hostile work environment and hurts the moral of the team." ECF No. 37-7, Def.'s Ex. G at 1. The written coaching recommended that, going forward, Crothers "conduct [herself] as a professional supervisor and not use any type of derogatory/hurtful statements immediately," that Crothers "follow the guidelines in the Sodexo employee handbook that pertains to treating everyone with dignity and respect," and that "[i]f any employee is not doing the same for [Crothers] . . . for [Crothers] to raise this to [her] Director or [Wagner]." *Id.* at 2. Finally, the written coaching described the consequences for failure to correct as follows: "Failure to correct this behavior and/or further violation of company policy will result in additional constructive counseling, up to and including termination of employment." *Id.* In her signed acknowledgement on the coaching, Crothers wrote that the statement made against her was false and that she neither spoke with the employees in question nor called them a derogatory name. *Id.* at 3.

At her December 19, 2023 meeting with Arana and Emmerich, Crothers denied calling the painters any derogatory names. Crothers then told Arana and Emmerich that one of the painters, one of two cousins by the name of "Cortez," was retaliating against her (Crothers) by fabricating the accusation because she rebuffed his sexual advances. ECF No. 43 at 7-8. Specifically, Crothers claimed that Cortez sexually harassed her between June of 2023 and November of 2023, by asking her out approximately five times, asking her to talk to him, and calling her his "wife" on two occasions. *Id.* at 8.

Crothers did not report this alleged harassment by Cortez until she learned that he had reported her for calling him names. *Id.* at 9.

Arana and Emmerich asked Crothers if she wanted to file a complaint regarding Cortez's alleged harassment, but Plaintiff declined. *Id.* at 9. Emmerich assured Crothers that the written coaching would "go away," and Crothers expected that the complaint would be dismissed. *Id.* at 9-10. Crothers was not at work from approximately December 22, 2023, to January 2, 2024, as she was on vacation. *Id.* at 10.

**Crothers's Complaint About Emmerich**

On January 12, 2024, Crothers reported to Arana and Wagner that Emmerich was condoning inappropriate discussions in the workplace, including jokes that were sexual or vulgar in nature. *Id.* at 10-15. When asked to describe the sexual jokes in her deposition in this case, Crothers recalled that in January of 2024, Cortez was talking to his cousin in the breakroom, while Emmerich and other staff were present; Cortez described his sexual conquest the day before with a woman that Cortez referred to as a "bitch," and Cortez stated that he had the woman "squirming." ECF No. 43-3, Crothers Dep. 36:12-38:18. Crothers admitted that Cortez was neither talking to Crothers nor about her when making this comment. *Id.* at 36:25-37:4. Other than this specific comment, Crothers indicated that the "crux" of why she believed Cortez's comments were sexually inappropriate was that Cortez referred to women as "bitches" and referred to "having sex with them."[1] *Id.*

---

[1] Vicki Swoboda, Emmerich's then assistant, also testified in her deposition in this case that she overheard employees talking inappropriately in the break room several times and yelled out "hey, knock it off" several times. Swoboda testified that most of the inappropriate conversations she overheard "were not sexual" but that she did hear jokes

at 38:19-39:24. Cortez never directed these conversations to Crothers but would speak loudly enough to be overheard. Cortez was the only Sodexo employee to have made comments that made Crothers uncomfortable, and he made similar comments before Emmerich started working; however, Crothers never complained about Cortez's language before Emmerich started working. *Id.* at 40:18-25; 59:21-60:3.

Emmerich never made any sexually inappropriate comments or said anything that Crothers found to be sexually harassing. *Id.* at 46:9-14. Rather, Crothers's complaint against Emmerich was that he "sat with the guys during some of these conversations" and allowed the conversations to continue for the "small window" consisting of the few weeks in January after Emmerich began working at the P&G site before Crothers complained. *Id.* at 46:7-23. Crothers alleges that the conversations and the implicit approval of the conversations by her direct supervisor, Emmerich, made her particularly uncomfortable because her workplace was male dominated.

After Crothers's January 12th complaint, Arana asked Crothers for a written statement regarding her concerns about Emmerich. Crothers declined to provide a written statement, stating that she would give Emmerich "some grace" because he had just started his employment. ECF No. 43 at 18-19.

Crothers never complained directly to Emmerich about his behavior. However, according to Crothers, Arana held a meeting with Crothers and Emmerich on January 18,

---

about how one guy spent a weekend with his brother and related to different sexual preferences. ECF No. 43-6, Swoboda Dep. 27:13-30:5, 64:13-16.

2024, regarding Crothers's concern that Emmerich allowed Cortez to use sexually explicit language in the workplace.[2] *Id.* at 21.

**Crothers's Weekend Floor Work With Temporary Employee Bass**

During the week of January 23, 2024, Crothers requested approval for temporary employees to work that week. Specifically, Crothers emailed Emmerich and Swoboda on January 23, 2024, asking for an order to be sent to a temporary staffing agency for four additional temporary workers for "the 2nd shift. 2:30pm-10:00pm" and one additional temporary worker "for the first shift 7:00am-3:00pm."[3] ECF No. 43-6 at 18. Emmerich and Swoboda approved the request. ECF No. 49 at 41-42. The parties dispute whether Crothers's request and Swoboda's approval of temporary workers included temporary workers for a weekend floor stripping and waxing project. *Id.* at 42.

On Friday, January 26, 2024, Emmerich asked Crothers if she had any projects scheduled for the weekend, and Crothers replied that she did not. ECF No. 43 at 22. However, Crothers did work on Sunday, January 28, 2024, and Crothers asked a temporary worker, Tayon Bass, to come in that Sunday to assist Crothers with the break room floor stripping and waxing project. *Id.* According to Crothers, the floor stripping

---

[2] Arana and Emmerich recalled that the January 18th meeting was to discuss Crothers's duties and to remind Crothers of the requirement that out-of-scope or overtime weekend work needed Emmerich's approval and that out-of-scope work also needed a quote and purchase order from P&G before the work could be performed. However, Crothers denies this fact, so the Court does not accept it for purpose of its analysis.

[3] It is not clear from the record, and the parties have not explained in their briefs, on what days of the week these shifts would have occurred.

and waxing project that she performed that Sunday was not considered a "special project," for which she needed approval from Emmerich, but was instead within-scope floor work. *Id.*

Under P&G's and Sodexo's MSA and St. Louis Site Agreement, certain work was designated within the scope or out of the scope of the agreement. Out-of-scope work required a bidding process and P&G approval, including a purchase order, before Sodexo would be paid for the work. *Id.* at 22-23. Sodexo has attached as an exhibit to its summary judgment motion a facility cleaning schedule.[4] ECF No. 37-10, Def.'s Ex. J. The schedule contains a checklist of certain cleaning tasks for various areas of the site and states that "Sodexo will perform any out-of-scope work under an additional purchase order." *Id.* at 5. The checklist does not reference "stripping" or "waxing" floors in any area. *Id.* at 1-14. However, with respect to the break room, the checklist does list "wet mop floors," "dust mop floors," and "scrub floor stains as needed," as tasks to be done daily; and it lists "scrub floors" as a task to be done two times a year. *Id.* at 12-13.

The parties dispute whether "stripping and waxing" is the same as "scrubbing," and also whether "stripping and waxing" was considered in scope or out of scope under the MSA. According to Crothers, "scrubbing" was the same as "stripping and waxing." ECF No. 43-3, Crothers Dep. 251:1-16. Osama (Thomas) Rammaha, a former Sodexo

---

[4] It is unclear from the record whether the MSA is a separate agreement from the facility cleaning schedule attached to Sodexo's summary judgment motion. However, the facility cleaning schedule is the only purported agreement between P&G and Sodexo that was attached to Sodexo's summary judgment motion; no other contract has been placed in the record.

EVS Supervisor at the P&G site (the role that Crothers held at the time of her termination), also testified in his deposition in this case that, while scrubbing is different from stripping and waxing, his understanding from his time as EVS Supervisor at the P&G site was that stripping and waxing were permitted without a purchase order and often took place on weekends due to safety issues. ECF No. 43-7, Rammaha Dep. 101:19-102:4, 119:6-120:15, 120:16-21; 122:9-18. Arana also confirmed that if a purchase order was required, such purchase orders would exist in Sodexo's records. ECF No. 43-4, Arana Dep. 128:13-129:2. However, Sodexo has not produced any such purchase orders in response to discovery requests. ECF No. 49 at 35-36.

**<u>Crothers's Confrontations With Temporary Employee Bass and Emmerich</u>**

On Sunday, January 28, 2024, Crothers got into a confrontation with Bass shortly after his portion of the strip-and-wax project was complete. Crothers told Bass to leave. Bass used profanity and called Crothers a "bitch" multiple times, including by saying "this bitch don't know who she messing with." ECF No. 43-3, Crothers Dep. 213:16–217:19. Crothers called security and told them she "had a staff member being disrespectful and violent and . . . threatening," and security informed Bass that he was not to return to the site. *Id.* 217:23–220:1.

After sending Bass home that Sunday, Crothers spoke to Arana by phone and informed him that Bass was cursing, irate, and yelling at Crothers, and that Crothers told Bass to leave and notified security that Bass was not allowed to return. ECF No. 43 at 26-27; ECF No. 43-4, Arana Dep. 118:6–119:9. Crothers told Arana that she had tried to reach out to Emmerich and that Emmerich did not return Crothers's phone calls. ECF

No. 43 at 27; *see also* ECF No. 43-3, Crothers Dep. 240:25-242:7. Arana told Crothers that Emmerich should have responded to Crothers and taken her call. *Id.*

Arana testified in his deposition in this case that he had no issue with Crothers's actions with respect to not allowing Bass to return and confirmed that Crothers "had every right and ability to do what she did." ECF No. 43-4, Arana Dep. 121:9-16. According to Crothers, on her call with Arana on that Sunday, the two engaged in the following discussion:

> He also stated to me that we have failed you at the highest level within Sodexo because you should not have been tasked with doing all that you're doing, and you know that we can't pay you for the second shift also. He never mentioned before, this is the first time that he had ever mentioned overtime, hours, or anything. And he said to me, You know you have a lot of overtime, and you shouldn't have been -- you know, you shouldn't be taxed with doing all that you were doing.

ECF No. 43-3, Crothers Dep. 241:14-24.

Later in the evening that Sunday, at 5:15 p.m., Arana emailed Emmerich and informed Emmerich that Crothers had called regarding Bass and that Crothers stated she was unable to contact Emmerich. ECF No. 37-12, Def.'s Ex. L, at 2. In his email, Arana attached several statements from Crothers and other witnesses describing Bass's conduct. Arana informed Emmerich that Crothers had spoken to security and the temp agency to ensure that Bass was not to return to the work site. *Id.* Arana further stated:

> I believe this is the end to the situation as this is a temp and we control who can work for us. My other concern is when speaking to [Crothers] she was once again onsite on a Sunday doing OT. I asked if you were aware of and she said no. So once again she is scheduling stripping and waxing on OT. I believe we have had this conversation with her as to not do any OT without your permission. I would ask you do a verbal written counseling on her for this as she is not following your direction on OT. She had 191 hours of OT

> last year for 6,900.00 in wages. I do understand that we need her to fill in on certain occasions when we are short but she must get this approved by you.

*Id.*

A few hours later, at 7:35 p.m., Emmerich responded by email to Arana stating:

> She did the job of stripping and waxing without a pwr or a p.o. We went over this with her together. She also worked unauthorized overtime and used temp labor. When she told the temp to go do cleaning in bldg. 82, he refused as he was only asked for the waxing. I think a write up is necessary and the temp needs to be brought back as he did not do anything wrong.
>
> I will say that Renee has been very disagreeable to the entire staff after the union spoke to the cleaners about their benefits and rights

*Id.*

The next morning, January 29, 2024, at 5:40 a.m., Arana responded to Emmerich's email advising him to "connect with Amy Kinge or send an e-mail to the People Center to open [an] investigation on [Crothers's] direct insubordination" in order to "help . . . with the HR side of this." *Id.* at 1. Emmerich responded approximately 20 minutes later, at 5:58 a.m., stating "[w]ill do." *Id.*

Also on the morning of January 29, 2024, Emmerich directed Swoboda to use her badge to allow Bass back on to the P&G site. Although the parties do not indicate the time at which this occurred, a Sodexo Security Incident Report form describing the incident notes the time as 6:15 a.m. ECF No. 43-10, Pl.'s Ex. 10, at 2. According to the Security Incident Report, Bass arrived at the gate and was told by security that he was not allowed on property. He then became "irate" with the officers, began cursing at the officers, and told the officers that "Mike" said to let him in. *Id.* Emmerich and Swoboda later arrived and told security officers that Bass was allowed to enter and that Crothers

"did not have the right to say who can and cannot come on the premises." *Id.* at 3. The officers advised Emmerich that Bass was "acting belligerent and cursing them," and Emmerich directed Swoboda to speak with Bass. *Id.* Shortly thereafter, at Emmerich's direction, Swoboda used her badge to allow Bass onto the site. *Id.*

At 6:37 a.m., Crothers texted Arana and informed him that security had called, Bass had arrived, and Emmerich had sent someone to the gate to pick Bass up but security would not let Bass in. ECF No. 37-14, Def.'s Ex. N. Crothers further stated that if Emmerich insisted on letting Bass in, she (Crothers) would go home for the day. *Id.*

Crothers then saw Emmerich and Swoboda escorting Bass onto the property and told Emmerich that Bass was not supposed to be on site and that she would not supervise Bass. ECF No. 43 at 31-32. After initially ignoring Crothers, Emmerich eventually responded: "I got him, I got him." ECF No. 43-3, Crothers Dep. 269:20-270:2. Emmerich and Swoboda escorted Bass to Sodexo's office on site, where Bass completed his statement. ECF No. 43 at 31-32.

After Bass provided his statement, Crothers asked Emmerich if she could speak with him, and the two spoke privately. Crothers asked Emmerich why Bass was allowed back on property. According to Crothers, Emmerich told her that he makes the decisions and disregarded Crothers's stated concerns regarding her safety. ECF No. 43-3, Crothers Dep. 283:5-284:12. Crothers then told Emmerich that he could not speak to her that way and that "ever since [Emmerich] started, [he had] been divisive." *Id.* After this exchange, Emmerich yelled for Swoboda to call security, and security escorted Crothers

away. *Id.* The parties dispute whether Crothers was screaming, cursing, or otherwise combative with Emmerich, with Crothers denying the same.

At 7:22 a.m. on January 29, 2024, Arana emailed Emmerich as follows:

> I would say even if [Bass] was asked to do a job and [Crothers] changed it he had no right cursing at her and acting the way he did. I would not bring him back on-site until you get his statement through the temp agency. It could cause more issues between them. I am just jumping in my flight to California now will reach out to you once I land. Use HR to help guide you.

*Id.* According to Emmerich, he did not see Arana's email until after he had already allowed Bass back on site.

At 7:39 a.m. that day, Emmerich responded to Arana's email and stated: "I had [Bass] here this morning for his statement. [Crothers] caused an issue and I sent her home for the day. We need to have a call after the DDS." ECF No. 37-12, Def.'s Ex. L, at 1.

In his deposition in this case, Arana testified that Emmerich should have been disciplined for defying his instruction and that Emmerich "made a bad call" and a "bad decision." ECF No. 43-4, Arana Dep. 123:3-14. But Arana did not believe that Emmerich was disciplined for this decision. *Id.*

**<u>Crothers's Suspension and Termination</u>**

Later in the morning of January 29, 2024, Emmerich emailed Amy Klinge, Sodexo's Director of Human Resources, copying Arana, and described in detail two issues he wanted to discuss with Klinge regarding Crothers. ECF No. 37-16, Def.'s Ex. P at 1. The first issue was what Emmerich described as "two instances of violating directives unquoted work and unapproved overtime." *Id.* With respect to this issue, Emmerich stated that he and Arana had met with Crothers on January 18, 2024 to

discuss her duties,[5] and at that meeting, Emmerich informed Crothers that stripping and waxing were not covered in the base contract and needed to be approved by Emmerich and accompanied by a purchase order from P&G, and that overtime for weekends needed to be approved by Emmerich. Emmerich stated that Crothers started a strip-and-wax job on Wednesday, January 24, 2024 that was not quoted and that Emmerich found out on Sunday, January 28, 2024 that Crothers had called in temporary employees to finish the project with her. *Id.*

The second issue Emmerich raised in his email to Klinge related to the incidents on January 28 and 29, 2024, regarding Crothers's confrontation with Bass, Emmerich's bringing Bass back onto the site, and Crothers's confrontation with Emmerich about this decision, including Crothers being escorted off site by security. *Id.* Emmerich concluded the email by asking for Klinge's "guidance as to how we should proceed." *Id.* at 2.

Sodexo placed Crothers on an investigatory suspension on January 29, 2024. ECF No. 43 at 45. Klinge could not recall who initiated the decision to suspend Crothers but indicated that it would be typical that the manager—in this case, Emmerich—would have "initiated everything with respect to [Crothers] because he was in the business unit" and "he had the evidence." ECF No. 43-11, Klinge Dep. 41:16-42:14. Later on January 29, 2024, Crothers emailed Wagner, Arana, and another Sodexo manager stating that she felt

---

[5] As noted above, Crothers disputes that this conversation took place at the January 18th meeting.

her suspension was "nothing more than retaliation" against her by Emmerich. ECF No. 43-5, Wagner Dep. at Ex. 2.

The next day, January 30, 2024, at 9:02 a.m., Emmerich emailed Sodexo's human resources People Center, stating that he had been working with Klinge on how to proceed regarding Crothers, and that Crothers had been placed on "investigatory suspension." ECF No. 37-17, Def.'s Ex. Q. Emmerich then reiterated the two issues he previously described in his email to Klinge, in largely similar detail. *Id.*

On February 2, 2024, Stan Rush, Sodexo's Employee Relations Manager, responded to Emmerich's email to the People Center and requested a list of information related to Emmerich's "recommendation to terminate." ECF No. 37-17, Def.'s Ex. Q at 1. The list included, among other things, details about the employee in question (Crothers), the concern or situation regarding the employee, how other employees with similar issues had been treated, the date of the most recent infraction, whether the employee was aware of the policy violated and how so, and whether the termination had been approved by two levels of operational management. *Id.* at 4. The list also asked for copies of relevant policies, counseling notices, suspension notices, employee and witness statements, and investigative documents. *Id.*

Separate from Sodexo, P&G investigated the incident involving Bass and emailed the results of its investigation to Klinge on February 6, 2024.[6] In these results, P&G concluded that by bringing Bass back on site, Emmerich and Swoboda "deliberately

---

[6] Emmerich had previously alerted Klinge that P&G's security team was investigating the incident. ECF No. 43-11, Arana Dep. at Ex. Klinge 5.

ignored P&G Security Policy even after advisement from Security. They not only put Janitorial Supervisor in danger, but also [Swoboda] and the whole site as well."[7] ECF No. 43-11, Arana Dep. at Ex. Klinge 4.

On February 6, 2024, Crothers emailed Klinge requesting an update on the status of her suspension. Klinge replied and explained that Sodexo's human resources department was still investigating, including reviewing all of the statements and details Crothers provided. ECF No. 37-20, Def.'s Ex. T.

On February 13, 2024, Employee Relations Manager Stan Rush emailed Emmerich, copying Klinge, and thanked Emmerich for taking time to review the details of the case. Rush stated in the email that, as he had discussed with Emmerich, there appeared to be "multiple policy violations that have surfaced during the investigation and review," and Rush "support[ed] the recommendation to terminate Renee Crothers for policy violations." ECF No. 37-21, Def.'s Ex. U. The "two most significant" policy violations cited by Rush in his email were "CP 101 Ethical Conduct – failure to safeguard company assets," and "CP 209 Workplace Violence – the use of threatening, intimidating or abusive language toward others." *Id.* Rush attached to his email a template that he suggested Emmerich could use to create the termination document and then return to Rush. *Id.*

On February 15, 2024, Sodexo terminated Crothers's employment. Klinge and Arana called Crothers to relay the termination decision, and Arana emailed Crothers a

---

[7] Sodexo asserts that P&G's findings constitute inadmissible hearsay. However, the Court need not resolve the issue because the findings do not alter the Court's analysis.

copy of her termination notice following their call. ECF No. 43 at 55. The initial termination notice described Crothers's unsatisfactory performance, behavior, or conduct that led to her termination as follows:

> Renee – on Sat, Jan 28, 2024, you scheduled and supervised an unapproved project, which required a temporary employee to work overtime, which was also unapproved. This occurred after you stated (during the morning DDS on Fri, Jan 27, 2024), that no weekend projects were scheduled.
>
> In addition to this, you sent several text messages to employees using threatening, intimidating, and abusive language.
>
> This is not the first time that your conduct has been a matter of concern. You received a Written Warning on 12/19/2023 related to your unprofessional conduct.
>
> Please understand this behavior is unacceptable and cannot be tolerated.

ECF No. 37-23, Def.'s Ex. W at 2.

The initial termination notice indicated that Emmerich was the individual who observed the behavior and described the policies violated as "CP-101 – Ethical Conduct (failure to safeguard company assets)" and "CP-209 – Workplace Violence (use of threatening, intimidating, or abusive language towards others)." *Id.* at 2-3. The initial termination notice was signed by Arana, with Klinge signing as a witness. *Id.* at 3.

The next day, February 16, 2024, Crothers emailed Klinge, stating that the termination notice was false and damaging to her character; that she had never engaged in workplace violence; that she was never insubordinate to Emmerich; and that she had only previously received written coaching, not a written warning.[8] ECF No. 37-24, Def.'s Ex.

---

[8] The termination notice listed three types of constructive counseling: written coaching, written warning, and termination. *See* ECF No. 37-23, Def.'s Ex. W.

X at 4. Crothers further stated that she had never sent threatening text messages to staff and indicated that her text messages to a staff member (Eiland) informing him of his continued behavior and possible consequences was not threatening. *Id.* Finally, Crothers stated that "[u]sing the words violence in the workplace carries a lot of weight and is unacceptable" and asked that that wording be redacted. *Id.*

A few days later, on February 20, 2024, Klinge responded to Crothers's email, stating that she was attaching an updated termination notice "correctly refer[ring] to [Crothers's] original constructive counseling (Dec 2023) as a 'written coaching.'" ECF No. 37-26, Def.'s Ex. Z at 1. Klinge also stated: "One of the reasons your employment with Sodexo was terminated was due to the hostile work environment you created within the P&G St. Louis Janitorial Team." *Id.* Klinge then included a portion of Sodexo's "policy against workplace violence" that listed "[u]se of threatening, intimidating, or abusive language and/or gestures" as an example of behavior that violates the policy. *Id.* Klinge ended her email by stating that "[o]ur zero-tolerance policy strongly guided our decision." *Id.*

The updated termination notice sent on February 20, 2024 corrected the reference to Crothers's prior counseling to reflect that she had received written "coaching" (as opposed to a warning) on December 19, 2023. *Id.* at 3. Otherwise, the updated termination notice was the same as the initial notice. *Id.* at 3-4.

In her deposition in this case, Klinge testified that she did not independently verify whether the stripping and waxing work referenced in the termination notice was in fact out of scope because it "was not in [her] scope of responsibilities to know the contract in

that fashion," but that Emmerich told her Crothers's work was out of scope, and she (Klinge) accepted Emmerich's conclusion. ECF No. 43-11, Klinge Dep. 63:10-25.

Arana testified in his deposition that Emmerich put together the termination notice. ECF No. 43-4, Arana Dep. 81:13-15. Arana further testified that he did not independently corroborate Emmerich's allegation that Bass worked overtime at Crothers's direction, but he accepted Emmerich's word for that. ECF No. 43-4, Arana Dep. 83:2-15. However, Arana further testified that "the main reason [Crothers] was terminated" was for working overtime, as referenced in his January 28th email to Emmerich, as well as for "doing work that wasn't supposed to be done and costing us money." *Id.* 123:13-124:2. Crothers's own overtime work was not referenced in her termination notice.

**Crothers Post-Termination Conversations with Rammaha and Lawsuit**

Crothers claims that in February of 2024, after her termination, her friend and former coworker, Rammaha, told her that Emmerich had stated he (Emmerich) wanted to "get rid of" Crothers because she reported him to Arana. ECF No. 43 at 61. As noted above, Rammaha was a Sodexo security officer who had previously served as the EVS Supervisor at the P&G site (the role Crothers held at the time of her termination). *Id.*

Emmerich was removed from his position at the P&G site in October of 2024, and his employment with Sodexo ended in November of 2024. ECF No. 43-4, Arana Dep. Ex. 1, Defs.' First Suppl. Answers and Objs. to Pl.'s Second Set of Interrogs., at p. 14.

Crothers filed suit in state court on March 19, 2025, asserting a single cause of action: retaliation under the MHRA.[9] ECF No. 1-1. Sodexo removed the suit to this Court, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332.

**Rammaha Declaration and Subsequent Deposition Testimony**

In August of 2025, Crothers obtained a signed declaration from Rammaha in support of her lawsuit. Crothers maintains that Rammaha dictated the substance of the statement, she (Crothers) transcribed it because of Rammaha's difficulties communicating in written English, and Rammaha agreed to sign the declaration without requesting any changes.

The declaration states that Rammaha was "competent" in making the declaration and was making the declaration based on his "personal knowledge and observations." ECF No. 37-29, Def.'s Ex. CC at 1. The declaration states:

> In January 2024 on or about the 18th or 19th, Mike Emmerich Director of Facilities Operations with Sodexo at the Procter and Gamble plant in St. Louis Missouri approached me at the security booth were [sic] I was working as a security officer for Sodexo, Mr. Emmerich stated to me "you're going to come and work for me as the EVS supervisor". I stated to Mr. Emmerich you already have an EVS supervisor Renee. Mr. Emmerich then stated "she won't be here long she will be gone in two weeks." I asked Mr. Emmerich what did she do, his response was she had no business speaking about me to my boss Rosendo Arana, she had no business complaining about me and what 1 do." I stated to Mike Emmerich that I was not interested in returning, I again declined his request.
>
> The following week Mr. Emmerich saw me again in the security booth and repeated his request for me to return. I again declined. I did however speak with someone regarding Mr. Emmerich requests because I was concerned

[9] According to her complaint, Crothers timely filed a charge of discrimination with the Missouri Commission on Human Rights on April 27, 2024, and received her notice of right to sue on January 27, 2025. ECF No. 13 at 2.

> that he could force me into leaving my position as a security officer and return as the EVS supervisor.
>
> A few days after Monday, January 29th word had spread that Renee Crothers the EVS supervisor had been sent home on the 29th.
>
> Mr. Emmerich approached me and stated that Renee Crothers was gone and he wanted me to come back as the supervisor. To my knowledge Renee Crothers was suspended but not terminated. Mr. Emmerich was speaking to me as if she was not returning and already terminated a few days after she was sent home.
>
> I again asked Mr. Emmerich what did she do? He stated "she talked to my boss complaining about me and she also came to work and did a special project stripping and waxing a breakroom floor." I informed Mr. Emmerich that she did nothing wrong in doing the floor because it was in scope per the contract with Procter and Gamble. I also informed him that the work cannot be performed during the week day's [sic] in that breakroom due to the usage from Procter and Gamble's staff and other contractors throughout the plant. It has to be performed on the weekends. He stated she also brought in a temp worker to perform this work.
>
> The security supervisor Marc Clement came and spoke with me regarding Mike Emmerich's constant solicitation for me to return as the EVS supervisor taking the place of someone who was still employed in that position. His behavior led me to believe that Mr. Emmerich planned weeks prior to terminate Ms. Crothers, I had to provide a statement regarding Mr. Emmerich's conversations with me regarding my return and the reasons he wanted me to return.
>
> I Osama (Thomas) Rammaha verify under penalty of perjury that the forgoing is true and correct.

*Id.* at 1-2. The declaration is signed by Rammaha and dated August 25, 2025. *Id.* at 2.

In his deposition in this case, Rammaha indicated potential worry that his testimony might lead to him losing his job. ECF No. 43-7, Rammaha Dep. 30:6-12. But he also testified that no one told him that he might lose his job and that no one from Sodexo suggested that he had to testify in a certain way. *Id.* at 30:13-18. And when asked whether, despite his worries, he would still give truthful testimony, he stated: "I

will say everything hundred percent true because I don't want to end up in jail," indicating that because he was "under oath," if he said something that was not true, he would end up in jail. *Id.* at 31:20-32:10. Rammaha also testified that he had a brain surgery in October of 2025, which affected his memory, but "not a lot"; he confirmed that his memory was better before the surgery. *Id.* at 23:6-22; 112:10-17.

In his deposition in this case, Rammaha testified about his close relationship with Crothers, how they knew each other's families, how they previously worked together, and how he got Crothers her job at Sodexo, which was his former job. *Id.* at 34-37.

With respect to Crothers's suspension and termination, Rammaha testified that Crothers called him and asked if he had heard about Crothers being escorted out, to which Rammaha replied that he "kn[e]w this is going to happen" because Crothers's "attitude [was] bad with [her] employees" and because "Mike offered [Rammaha] [Crothers's] job." *Id.* at 39:1-9.

When asked what Crothers told Rammaha about the claims she would be alleging in her lawsuit, Rammaha indicated that Crothers told him about the Bass incident and that the relationship between Crothers and Emmerich had soured because Crothers was rude to Emmerich and had performed stripping and waxing without approval, which cost Sodexo money. *Id.* at 55:16-56:16.

With respect to Emmerich offering Rammaha Crothers's job, Rammaha testified that Emmerich approached him at his security booth and asked if Rammaha was coming back to his old position. *Id.* at 40:18-41:21. When Rammaha asked "what about [Crothers]?," Emmerich responded that Crothers would be fired within two weeks. *Id.* at

40:18-41:21. Rammaha testified that he could not remember the date on which this conversation occurred but that the conversation lasted 10-15 minutes. *Id.* at 42:7-13.

Rammaha testified that when Crothers asked him about this conversation, Rammaha confirmed that Emmerich made those comments and that Emmerich again offered Rammaha the job in another conversation "maybe two weeks" later. *Id.* at 41:22-45:21. Rammaha testified that he did not want to go back to his old job and was happy in his new position. *Id.* at 41:22-42:3. Rammaha also testified that all of Crothers's employees had told him (Rammaha) that Crothers's attitude was a problem, but that Emmerich had never said anything to him about Crothers's attitude. *Id.* at 52:8-53:13.

With respect to his signed declaration, Rammaha testified that Crothers asked him to be a witness in this lawsuit, that she wrote the statement based on conversations with him because his English was "not perfect," and that Rammaha signed it. *Id.* at 56:18-61:15. When shown a copy of his signed declaration at his deposition, Rammaha testified that certain of the words, like "competent" and "declaration" were not his words, and that the whole statement was Crothers's idea, rather than Rammaha's idea. *Id.* at 66:11-21; 72:16-73:24. However, Rammaha also testified that before he met with Crothers to sign the declaration, Crothers called him and read the declaration to him. *Id.* at 70:7-8. Rammaha testified that when he met with Crothers, she already had the declaration printed out, no one else was present with him and Crothers, and he read the declaration one time before signing it. *Id.* at 70:15-71:12. In response to questioning as to why he did not type the statement himself, Rammaha responded: "I can't write it like the way she wrote it.· I told you, my English language is not perfect." *Id.* at 68:13-15.

In response to questioning about whether Rammaha asked Crothers to make any changes to the declaration before signing it, Rammaha testified as follows:

> A. I believe there is one section I told her, when she says -- the last sentence here, it say: His behavior led me to believe that Mr. Emmerich planned weeks, period, to terminate Ms. Crothers. I have to provide the statement regarding Mr. Emmerich conversation with me regarding my return and reasons he want me to return.
>
> Actually, it's not my idea. It's her idea.
>
> Q. Okay. Did you ask her to change it?
>
> A. Yes.
>
> Q. Okay.
>
> A. She didn't.
>
> . . .
>
> Q. Okay.· But you signed it any way?
>
> A. After I signed it, I say:· Renee, I'm not happy with this sentence.
>
> Q.· Okay. And why were you not happy with that section?
>
> A. Because I didn't -- I didn't thought that he want to fire her, like, before long time. I know that he want to fire her when he approach me.
>
> Q. Okay.
>
> A. That's the only time.
>
> Q. Okay.
>
> A. And I notice here, when you ask me earlier about what is the problem, yeah, I remember when I read the sentence here that she told me that he was upset that she called Mike manager complaining about Mike.
>
> Q. Okay.
>
> A. Yeah.
>
> Q. So that's something you heard from Renee?

A. Yeah.

Q. Did Mike ever tell you –

A. Never.

Q.-- he was upset?

A. No, never.

. . .

Q. It says: I asked Mr. Emmerich what did she do? His response was: She had no business speaking about me to my boss, Rosendo Arana. She had no business complaining about me and what I do.

Is it your testimony today that he did not -- Mike did not say that to you?

. . .

THE WITNESS:· I say I can't remember, but when I read it, I remember.

Q. When you read it, you remember what?

A. That Mike was upset because -- of course not Mike told me, it's her told me. Renee told me.

Q. Okay.

A. That he is upset because she called his boss.

. . .

Q. Okay.· It goes on, the next paragraph, and says:· I again asked Mr. Emmerich what did she do?· He stated:· She talked to my boss complaining about me, and she also came to work and did a special project stripping and waxing a break room floor.

Do you see that?

A.· Yes.

Q. Okay.· Did Mr. Emmerich tell you those things?

A. I can't remember that.

Q. Okay.

A. But she told me that.

Q. Okay.· Renee told you that?

A. Yeah, hundred percent.

*Id.*at 71:19-73:12; 78:2-24; 97:6-20.

Rammaha then testified regarding the day that Crothers was "walked out," and how another employee, Joe Smith, told Rammaha that Crothers and Emmerich "got into it" that day. *Id.* 87:16-88:12. Along, these lines, Rammaha also testified that another maintenance employee named "Randy" told him that Crothers "called Mike boss complaining about Mike, Mike didn't like that." *Id.* at 88:19-89:4.

Rammaha further testified that on another occasion, Emmerich himself told Rammaha that he "might get fired" because his manager "wasn't happy" with him. *Id.* 88:25-89:7. Rammaha could not remember exactly when this conversation occurred but recalled that it was one day before Emmerich himself was escorted out of the P&G site. Rammaha was not aware the Emmerich in fact worked at the P&G site until October of 2024. *Id.* at 90:9-91:12.

In response to questioning by Crothers's counsel, Rammaha testified that he had an opportunity to review everything in the declaration, read the declaration before he signed it, and voluntarily signed it. *Id.* at 112:23-113:7.

**ARGUMENTS OF THE PARTIES**

In support of its motion for summary judgment, Sodexo argues that Crothers fails to establish a genuine dispute as to any material fact, and Sodexo is entitled to summary judgment because: (1) Crothers cannot establish that she engaged in any protected

activity under the MHRA; (2) Crothers has no evidence that her purported protected activity was the motivating factor on Sodexo's decision to terminate her; (3) Sodexo had legitimate, non-discriminatory reasons for terminating Crothers; and (4) Crothers has no evidence of pretext. In support of its arguments, Sodexo also contends that Crothers cannot rely on Rammaha's declaration to create a genuine issue of material fact because it is fundamentally unreliable in that, according to Rammaha's deposition testimony, the declaration does not reflect his personal knowledge, was not prepared in his words, contains statements he never made, and was signed under circumstances suggesting he did not understand its content or legal significance.

Crothers opposes Sodexo's motion and argues that there are genuine issues of material fact that preclude entry of summary judgment. Specifically, Crothers argues that the evidence shows that she engaged in protected activity under the MHRA by reporting that Emmerich condoned and participated in conversations describing women as "bitches" and recounting sexual acts. She further asserts that her reporting of Cortez's repeatedly asking her out, calling her his wife, and retaliating against her when she rebuffed him constituted protected activity.

Crothers also argues that she has direct evidence of retaliation in the form of Rammaha's declaration containing a party admission by Emmerich that Crothers would be terminated because she talked to Emmerich's boss and complained about him. Crothers contends that Rammaha's deposition is consistent with his declaration and was properly prepared. To the extent that Rammaha testified in his deposition in a way that

contradicted his declaration, Crothers argues that resolving that inconsistency is the kind of credibility determination that cannot be resolved on summary judgment.

Finally, Crothers argues that there is evidence of pretext for any purported non-discriminatory reasons for her termination. Specifically, Crothers relies on the following factors to show pretext: (i) temporal proximity between her protected activity and termination; (ii) evidence that Emmerich, the allegedly retaliatory decision-maker, was the sole architect of the termination; (iii) evidence that the purported reasons for her termination—namely, that the stripping and waxing work were out of scope, that temporary employee Bass worked overtime,[10] that Emmerich did not know about Crothers's use of a temporary worker, and that Crothers sent threatening or abusive text messages to employees—were all objectively false; (iv) evidence that Sodexo rationale for terminating Crothers changed over time; and (v) evidence that similarly situated employees were not terminated.

## DISCUSSION

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the

---

10 In support of her assertion that Bass did not in fact work overtime with respect to the stripping and waxing work in question, Crothers attaches to her opposition brief what appear to be time records for Bass from a temporary employee agency. Sodexo argues that the time records are not authenticated or verified in any way. *See* ECF No. 49 at 15. In any event, Sodexo maintains that "[r]egardless of whether Bass actually worked overtime, Emmerich and Arana reasonably believed at the time that unauthorized overtime had been or would be incurred by Plaintiff and based on Plaintiff scheduling a temporary worker on a Sunday without prior authorization." *Id.*

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, *Howard v. Columbia Public School District*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens Loan and Savings Co.*, 621 F.2d 911, 913 (8th Cir. 1980). Rather, the plaintiff "must identify and provide evidence of specific facts creating a triable controversy." *Howard*, 363 F.3d at 800 (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

**<u>Retaliation</u>**

As relevant here, the MHRA makes it an unlawful discriminatory practice to retaliate "in any manner" against an employee who "has opposed any practice prohibited" by the statute. Mo. Rev. Stat. § 213.070(2). To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) she engaged in protected activity under the MHRA; (2) the employer took adverse action against her; and (3) a causal relationship existed between the protected activity and the adverse action. *LaBranche v. Cir. Ct. of Jackson Cnty.*, 703 S.W.3d 226, 235 (Mo. Ct. App. 2024) (citation omitted). In deciding a case under the MHRA, courts "are guided by both Missouri law and federal

employment discrimination caselaw that is consistent with Missouri law." *Li Lin v. Ellis*, 594 S.W.3d 238, 242 (Mo. 2020); *see also Barrett v. Cole Cnty.*, 687 S.W.3d 685, 697 (Mo. Ct. App. 2024) ("Missouri courts have long relied on federal employment discrimination case law, to the extent that it is consistent with Missouri law, when considering questions of law regarding the MHRA.").

**1) <u>Protected Activity</u>**

With respect to the first element—whether the plaintiff engaged in a protected activity—"[i]t is irrelevant to a claim of retaliation that the act complained of was not legally actionable. The only issue is whether the person making the complaint had a reasonable good faith belief that there were grounds for the claim of discrimination or harassment." *Emile v. Triumph Foods, LLC*, 713 S.W.3d 197, 211 (Mo. Ct. App. 2025) (quoting *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 48 (Mo. App. 2016)); *see also Moore v. Sw. Bell Tel. Co.*, 684 S.W.3d 187, 200 (Mo. Ct. App. 2023) ("[A]as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim.") (citation omitted). However, determining whether an employee has a "reasonable, good faith belief" that there were grounds for a claim of discrimination or harassment "necessarily requires some reference to the elements of the type of discrimination alleged." *Lovelace v. Wash. Univ. Sch. of Med.*, 931 F.3d 698, 707 (8th Cir. 2019).

Crothers contends that she reasonably and in good faith believed that she was complaining of a sexually hostile work environment, prohibited by the MHRA, when she

complained on January 12, 2024, about Emmerich's failure to stop Cortez's inappropriate conversations.

The MHRA prohibits employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." Mo. Rev. Stat. § 213.055.1(1)(a) (2017). A claim of harassment or hostile work environment under the MHRA requires a plaintiff to plead that "(1) she is a member of a group protected under the MHRA; (2) she was subjected to unwelcome harassment; (3) her membership in the protected group was a motivating factor in the harassment; and (4) a term, condition, or privilege of her employment was affected by the harassment." *Elder v. Washington Univ. - St. Louis*, 733 S.W.3d 626, 650 (Mo. Ct. App. 2026) (emphasis removed), *reh'g denied* (May 4, 2026).

"To satisfy the fourth element, [the plaintiff] must show that the harassment affected a term, condition, or privilege of employment by either causing a tangible employment action or an abusive working environment." *Allen v. Mo. Highways & Transp. Comm'n*, 710 S.W.3d 568, 580 (Mo. Ct. App. 2025) (emphasis removed). The standard is "demanding," is viewed considering "the totality of the circumstances," and requires that the "harassing conduct must be so intimidating, offensive, or hostile that it poisoned the work environment and that the workplace was permeated with discriminatory intimidation, ridicule, and insult, both viewed subjectively by the plaintiff and viewed objectively by a reasonable person." *Id.* at 581.

A recurring theme in both federal and Missouri caselaw is that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001); *Torre-Stewart v. Washington Univ.-St. Louis*, 732 S.W.3d 187, 202 (Mo. Ct. App. 2026) (holding same under Missouri law), *reh'g denied* (Mar. 30, 2026). Likewise, "[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to support a claim of hostile work environment. *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006).

As noted above, the alleged sexual harassment Crothers complained of consisted of her supervisor failing to shut down a co-worker's (Cortez's) stray references to unidentified women as "bitches" and that same co-worker's reference on a single occasion of an unidentified woman "squirming" during sexual intercourse. Crothers also vaguely refers to Cortez having other sexually explicit conversations but has not described the other conversations in any detail. Crothers admits that Cortez's comments were not directed to her and were not about her.[11] Further, Crothers admits that Cortez's alleged harassing conduct began long before Emmerich started work, that she did not complain about the conduct until January 12, 2024, and that Emmerich never made any such sexually inappropriate comments but was merely present for Cortez's comments and

[11] As discussed further below, Crothers also complained of earlier romantic advances that Cortez made directly to her, between June and November of 2023, before Emmerich began working at the P&G site. But she has never argued or provided any evidence that her termination was causally related to that complaint. Rather, her entire theory of causation is that her termination was in retaliation for her complaint about Emmerich condoning Cortez's later sex-related comments that were not directed to Crothers but were made in Crothers's presence.

did not stop them. Finally, Crothers admits that the time frame during which Emmerich would have been present during any sexually explicit comments by Cortez was incredibly short, consisting of only a couple weeks between when Emmerich began working at the site on December 18, 2023 and when Crothers complained on January 12, 2024, especially considering that Crothers was on vacation (and therefore certainly not subject to any offensive workplace conversations) from December 22, 2023 to January 2, 2024.

No reasonable person could believe that Crothers's single complaint to her employer regarding her supervisor's mere passive witness to a coworker's use of the term "bitch" and description of sexual intercourse in conversations neither directed at nor about Crothers over the course of only a couple weeks was a complaint of sexual harassment severe enough to constitute a violation of the MHRA.[12] Applying similar standards under Title VII, the Supreme Court and Eighth Circuit have both held that objecting to stray offensive remarks—even remarks made by supervisors themselves—is insufficient as a matter of law to constitute protected activity for the purpose of a retaliation claim.

For example, in *Clark County School District v. Breeden*, 532 U.S. 268 (2001), the Supreme Court found that a retaliation claim premised on an employee's objection to a single sexually offensive remark made by her male supervisor, while chuckling, failed as a matter of law. 532 U.S. at 269–71. The Court held that the supervisor's remarks were

---

12 In light of this finding, the Court need not reach Sodexo's alternative argument that Crothers's complaints were also not protected activity because they were not made in good faith, for the purpose of correcting misconduct, but instead to retaliate against the individual (Cortez) who previously complained about her.

at worst "an isolated incident that cannot remotely be considered extremely serious," and that no reasonable person could have believed the remarks violated Title VII's prohibition against sexual harassment. *Id*. at 271.

Likewise, in *Brannum v. Missouri Department of Corrections*, 518 F.3d 542 (8th Cir. 2008), the Eighth Circuit found that an employee's complaint about a supervisor's offensive, gender-related comment was insufficient as a matter of law to constitute protected activity for a retaliation claim. 518 F.3d at 548–49. Other courts applying similar legal standards have followed suit and held that objecting to stray—albeit offensive—remarks or conduct by coworkers or supervisors is insufficient to constitute protected activity for a retaliation claim. *See, e.g.*, *Curd v. Hank's Disc. Fine Furniture, Inc.*, 272 F.3d 1039, 1041–42 (8th Cir. 2001) (employee's email objecting to a salesman opening his pants on a showroom floor to tuck his shirt in did not constitute protected activity); *Yarnell v. Mercy Clinic Springfield Cmtyts.*, No. 6:22-CV-03123-RK, 2023 WL 7133432, at *6–7 (W.D. Mo. Oct. 30, 2023) (employee's complaint about a supervisor commenting on her "booty shorts" was not protected activity); *Ramirez v. City of Fredericktown, Mo.*, No. 1:13-CV-2 SNLJ, 2013 WL 1991405, at *6 (E.D. Mo. May 13, 2013) (employee's complaint about her supervisor's late-night, inappropriate text messages to her was not protected activity); *Whatley v. United Parcel Serv., Inc.*, No. 4:08CV01108 ERW, 2009 WL 3756624, at *7–8 (E.D. Mo. Nov. 6, 2009) (objecting to a female co-worker commenting on a male colleague's weight and patting him on the rear was not protected activity).

This is particularly true where, as here, the offensive comments came from a coworker, rather than a supervisor, and were not even directed to the employee. *Cf. McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 750-54 (Mo. Ct. App. 2011) (holding there was sufficient evidence that a school district employee had a good faith, reasonable belief that his own supervisor's use of the word "bitch" in the workplace to describe female board members violated the law); *Smith v. Hy-Vee, Inc.*, No. 07-0565-CV-W-DW, 2009 WL 10701760, at *2–6 (W.D. Mo. Mar. 27, 2009) (finding that an employee's complaints of sexual harassment between 66-101 times, including complaints of a supervisor smacking the plaintiff on the butt approximately six times and shoving her against the wall and rubbing her body for 10 to 15 seconds, constituted protected conduct "based both on the conduct complained of, and the sheer number of complaints at issue"), *aff'd,* 622 F.3d 904 (8th Cir. 2010). The fact that Crothers declined to pursue a formal complaint against Emmerich (or Cortez, for that matter) also supports that she did not believe that the conduct was so severe as to constitute a violation of the employment discrimination laws. *See Whatley*, 2009 WL 3756624, at *7 (holding that employee's statement that he did not wish to file harassment charges indicated that he believed the conduct did not amount to unlawful harassment).

**2) <u>Causal Connection and Pretext</u>**

Even assuming that Crothers could establish that her January 12, 2024 complaint that Emmerich did not stop Cortez's offensive conversations constituted protected activity under the MHRA, no reasonable jury could conclude that the complaint was causally connected to her termination.

Under the MHRA, a "plaintiff must satisfy the causation standard by demonstrating that [her] complaint of discrimination was a motivating factor in the defendant's adverse employment action." *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 467 (Mo. Ct. App. 2024). Federal caselaw informs the Court's analysis because the MHRA's "motivating factor standard is largely analogous to the [standard] used in employment discrimination claims under federal law." *Barrett v. Cole Cnty.*, 687 S.W.3d 685, 697 (Mo. Ct. App. 2024) (citations omitted). As under federal law, the MHRA requires that a plaintiff either "offer direct evidence of retaliation or create an inference of retaliation under the *McDonnel Douglas*[13] burden-shifting framework." *Shiffman*, 687 S.W.3d at 467 (citation omitted).

a. **Direct Evidence**

"To be considered direct evidence of discrimination, a remark must be by a decisionmaker and show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 832 (8th Cir. 2020) (quoting *Torgerson*, 643 F.3d at 1045–46). The term "direct" evidence "refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Torgerson*, 643 F.3d at 1044 (8th Cir. 2011). A plaintiff needs "strong (direct) evidence that illegal discrimination motivated the employer's adverse action" in order to avoid the *McDonnell Douglas* analysis and requisite showing of pretext. *Id.*

---

13 *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

"[S]tray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 620 (8th Cir. 2017) (citations omitted). Further, "'[d]irect evidence does not include statements by decisionmakers that are facially and contextually neutral.'" *Id.* (quoting *Torgerson*, 643 F.3d at 1045).

Crothers relies on the Rammaha declaration for direct evidence of a retaliatory motive here. As noted above, Sodexo argues that the Rammaha declaration cannot support Crothers's opposition to summary judgment because it is fundamentally unreliable and was not made based on Rammaha's personal knowledge.

"A declaration used to oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the [declarant] is competent to testify on the matters stated." *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (citing Fed. R .Civ. P. 56(c)(4)). "In some instances, courts will infer personal knowledge from the content" of the statements contained therein. *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111–12 (8th Cir. 2005). But a party cannot create issues of fact from a witness affidavit that the witness contradicts in his subsequent deposition. *See Canal Ins. Co. v. Kwik Kargo, Inc. Trucking*, No. CIV.08-439JNERLE, 2009 WL 1086524, at *3 (D. Minn. Apr. 21, 2009) (citing *Darnell v. Target Stores,* 16 F.3d 174, 176–77 (7th Cir. 1994)).

Here, Rammaha, who lacked strong English skills, made plain that Emmerich never said that he was upset that Crothers complained about him to his superiors and that statement, instead, came from Crothers. Therefore, the declaration does not create an

issue of fact on this point. In any event, the declaration on its face, when viewed in the context of the summary judgment record as a whole, does not constitute direct evidence of a retaliatory motive. Even accepting the declaration as true, at best, the declaration merely indicates that Emmerich was unhappy about Crothers's complaints about him to Arana. But the declaration nowhere indicates that Crothers's complaints were about Emmerich's condoning any sexually explicit conversations, which is the *only* purported ground for protection at issue here. The summary judgment record reflects that Crothers also made complaints about Emmerich that had nothing to do with sexual harassment. Indeed, the more obvious complaint that Crothers made about Emmerich to Arana—and the one that directly preceded her suspension—was Crothers's complaint to Arana about Emmerich's handling of the incident with temporary employee Bass.

As noted above, in his deposition, Rammaha clearly testified that it was Crothers who told him that Emmerich was angry about Crothers's complaints about him. In her opposition to summary judgment, Crothers relies on Rammaha's deposition testimony that other employees, Joe Smith and a maintenance employee named "Randy," also told Rammaha that Emmerich was upset with Crothers for complaining to Arana. It is questionable whether Crothers could offer these third-party statements in an admissible form at trial, and Crothers has made no such showing. *See* Fed. R. Civ. P. 56(e). And there is no evidence whatsoever of the basis for "Randy's" hearsay statement.

But even if Crothers could make the necessary showing of admissibility, Rammaha himself indicated that the statements by Joe Smith and Randy came around the time that Crothers was being "walked out," i.e. after the Bass incident. In other words,

Rammaha's own testimony suggests that any rumors about Emmerich being angry at Crothers for complaining about him were referencing Crothers's complaints about the Bass incident, not Crothers's earlier complaint of Emmerich condoning Cortez's offensive comments.[14]

In short, Crothers offers insufficient direct evidence of a retaliatory motive for her termination. Therefore, the Court turns to the *McDonnell Douglas* analysis.

b. ***McDonnell Douglas* Analysis Pretext**

Under the *McDonnell Douglas* burden-shifting analysis, the employee bears the initial burden to establish a prima facie case of retaliation, which as noted above, includes demonstrating "a causal relationship existed between the protected activity and the adverse action." *LaBranche*, 703 S.W.3d at 235. If the employee makes this prima facie showing, "the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Shiffman*, 687 S.W.3d at 467 (citation omitted). "If the employer articulates a legitimate reason for the adverse employment action, the plaintiff may create a triable question as to retaliation by showing the employer's articulated reason was not the true reason for the adverse action." *Id.*

In light of the fully developed summary judgment record, the Court assumes without deciding that Crothers has presented a prima facie case and turns directly to the

[14] Rammaha also testified that he personally witnessed Emmerich being concerned about potential discipline by a supervisor. But as noted above, Rammaha stated that this encounter with Emmerich occurred the day before *Emmerich* himself was escorted off the P&G site, potentially around the time Emmerich was removed from his position in October of 2024. There is no evidence that Emmerich's concern had anything to do with Crothers's January 12, 2024 complaint of Emmerich condoning offensive conversations.

question of whether Sodexo's nondiscriminatory reasons for termination were pretext for retaliation. *E.g., McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 864 (8th Cir. 2009) (noting that such an approach is appropriate at the summary judgment stage). "An employee's attempt to prove pretext requires more substantial evidence of discrimination than required to make a prima facie case because we view this evidence in light of the reasons articulated by the employer." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014).

According to Sodexo, Crothers was terminated because she engaged in insubordination and policy violations that included her confrontation with Emmerich regarding the Bass incident; performing out-of-scope work without a purchase order and after telling her supervisor that no weekend projects were scheduled; incurring unauthorized overtime work for herself and for temporary employee Bass; and mistreating employees. Sodexo has provided at least some record support for these assertions. Sodexo has thus satisfied its burden to provide a legitimate, nondiscriminatory reason for Crothers's termination. *See Nelson v. Lake Elmo Bank*, 75 F.4th 932, 937–38 (8th Cir. 2023) (holding that alleged violation of company policy is a legitimate reason for termination). The only remaining question is whether Crothers has sufficient evidence that Sodexo's proffered reasons were pretext for retaliation.

i. *Timing*

Crothers relies heavily on temporal proximity as evidence of pretext here. She correctly notes that her suspension occurred only 17 days after her January 12, 2024 complaint regarding Emmerich. But generally "more than a temporal connection

between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir. 2000).

Here, it is important that the concern about Crothers's mistreatment of employees and policy violations began well before Emmerich even became her supervisor. It is undisputed that Arana received complaints or reports of three such incidents involving Crothers in November of 2023; on November 28, 2023, which resulted in a recommendation for written coaching[15]; and on December 18, 2023, at which time Arana told Crothers to "tone it down."

More importantly, the events of the January 28, 2024 weekend—including the strip and wax job and resulting overtime, the Bass incident, and Crothers's subsequent confrontation with Emmerich— "constituted intervening conduct that negated an inference of a causal connection." *Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1117 (8th Cir. 2023). There is no evidence whatsoever that these intervening events had anything to do with Crothers's January 12, 2024 complaint that Emmerich condoned sexually inappropriate conversations. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (holding that an employee's angry outbursts in the presence of coworkers constituted "intervening unprotected conduct [that] eroded any causal

[15] Although Crothers contends that Emmerich told her the written coaching would "go away," there is no evidence that Emmerich had the authority to remove the coaching—which was initiated by Arana before Emmerich even began working for Sodexo—or that Sodexo in fact removed the coaching from Crothers's employment records. Rather, the undisputed evidence is that Sodexo had multiple documented complaints against Crothers by employees that predated Emmerich's tenure at Sodexo.

connection that was suggested by the temporal proximity of his protected conduct and his termination"); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000) (plaintiff's intervening inappropriate confrontations with a student-worker "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination"). Indeed, in his deposition, Rammaha testified that when he asked Crothers about the claims in her potential lawsuit, she told him about the Bass incident and that her relationship with Emmerich had soured because she was rude to him and performed the stripping and waxing without approval.

In fact, it is undisputed that it was Arana, not Emmerich, that first expressed concern that Crothers's unapproved weekend strip-and-wax work and resulting overtime—which occurred after Crothers's allegedly protected activity—constituted direct insubordination warranting intervention by human resources. In light of these substantial intervening events, no reasonable jury could conclude that mere temporal proximity shows pretext here.

ii. *Emmerich's Role in Termination*

Crothers also argues that Emmerich harbored a retaliatory animus and was the "sole architect" of her termination. Crothers does not allege or offer evidence that the other decisionmakers who ordered her termination—Arana, Klinge, and Rush—were operating under any retaliatory animus. However, she contends that these other neutral decisionmakers relied solely on Emmerich's judgment and did not independently investigate Emmerich's reasons for terminating Crothers.

In other words, Crothers asks the Court to infer that these neutral decisionmakers simply rubber stamped Emmerich's concerns. But the Eighth Circuit has cautioned that this type of speculation is insufficient to meet a plaintiff's burden at the pretext stage. In *Johnson v. Securitas Security Services USA, Inc.*, 769 F.3d 605 (8th Cir. 2014), a supervisor alleged to have animus "was but one of three people making the decision to terminate [the plaintiff's] employment, each of whom believed [the employee] had engaged in at least one terminable offense." 769 F.3d at 612. As here, the employee "ask[ed] the court to infer [the biased supervisor] prevailed on [the neutral ones] to take advantage of [employee's alleged policy violations] to fire [the employee] because of his [protected status]." *Id.* The Eighth Circuit held that, while that theory might meet the "relatively minimal threshold required to establish a prima facie case" with respect to causation, at the pretext stage, such speculation was insufficient to "raise genuine questions of material fact regarding whether [the employer's] stated reasons were pretext." *Id*. at 612-13. *See also Lovelace*, 931 F.3d at 706, n.3 (holding that such a "cat's paw" theory of liability "requires that there be a person possessing both (1) the necessary [retaliatory] animus and (2) influence, leverage or control over the decisionmaker, such that it could be said the decisionmaker was acting at the person's bidding") (citation omitted).

No reasonable jury could conclude that Arana, Klinge, and Rush were merely acting at Emmerich's bidding so as to demonstrate pretext here. Although these decisionmakers did not independently evaluate all of Emmerich's claims, the record reflects that many of the concerns regarding Crothers that ultimately led to her

termination predated Emmerich's tenure at Sodexo. For example, Crothers's history of documented complaints of mistreatment of subordinates began months before Emmerich started working at Sodexo. And it was Arana, not Emmerich, that first initiated discipline against Crothers for that mistreatment. Likewise, it was Arana, not Emmerich, who first expressed concern regarding Crothers's unapproved projects and overtime work. *See, e.g.*, ECF No. 43-3, Crothers Dep. 241:14-242:7 (describing Arana's concerns regarding Crothers's overtime hours); ECF No. 37-12, Def.'s Ex. L, at 2 (Arana's email to Emmerich about his concerns that Crothers was "again" scheduling overtime work without permission).[16] Crothers's theory that Emmerich was, effectively, the sole decisionmaker cannot be reasonably inferred from the record.

iii. *False Reasons For Termination*

Next, Crothers contends that she can demonstrate pretext by showing that each of Sodexo's stated reasons for termination is unworthy of credence. However, "the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Nelson*, 75 F.4th at 938 (citation omitted). This is true even if the employer's asserted reasons were "erroneous, unwise, or even unfair," so long as the employer truly believed that the employee engaged in the conduct justifying termination. *Main v. Ozark Health*, 959 F.3d 319, 325 (8th Cir. 2020).

---

[16] In fact, Arana was somewhat supportive of Crothers and critical of Emmerich's actions regarding the Bass encounter.

More importantly, "[t]he core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for discharging its employee, but rather concerns whether the employment decision was based upon intentional discrimination." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir. 2000).

Thus, Crothers's evidence regarding whether she in fact mistreated employees, whether her strip-and-wax work was in fact out of scope or required a purchase order, whether Bass in fact worked overtime, or whether Emmerich in fact authorized her use of temporary workers[17] does not control. The only material issue is whether Sodexo honestly believed in the reasons it offered for Crothers's termination or whether its reason was instead retaliatory animus related to Crothers's purported protected activity.

Here, Crothers's prior written coaching for mistreating employees—which pre-dated the alleged protected activity here—supported her termination. Indeed, even Crothers's own witness, Rammaha, testified that Crothers's bad attitude and poor treatment of employees was well known. ECF No. 43-7, Rammaha Dep. 39:1-9. Although the written coaching Crothers received did not result in termination at that time, Sodexo warned Crothers that further incident may result in termination. And Crothers's false statement that no weekend projects were scheduled and her strip-and-wax work involving overtime hours—which Arana described at the time as insubordination—as

[17] There is no dispute that Crothers falsely told Emmerich that no projects were scheduled on the weekend in question.

well as her subsequent confrontation with Emmerich over the Bass incident occurred only a little over a month after the written coaching.

Crothers's disagreement with Sodexo's handling of the January 28th weekend events is also immaterial. Regardless of whether P&G believed Crothers's actions were justified and Emmerich's were not, or whether Emmerich made a bad business judgment in allowing Bass back on the property, there no question that Crothers was "rude" to Emmerich and confronted Emmerich about it in a way that resulted in her being escorted off the property by security. *See Nelson*, 75 F.4th at 941 (holding that inconsistencies in accounts of whether an employee committed misconduct were insufficient to demonstrate pretext for discrimination). The record is simply insufficient to demonstrate that Crothers's termination was not, in fact, due to these events and the other reasons given by Sodexo and was instead due to Crothers's single, relatively benign complaint weeks before about Emmerich being present during inappropriate workplace conversations.

iv. *Changing Rationales*

In the same vein as her argument that Sodexo's reasons for termination were objectively false, Crothers also argues that Sodexo's changes in its stated reasons give rise to an inference of pretext. Specifically, Crothers maintains that Arana's reference to Crothers's overtime as one of the "biggest reasons" she was terminated arose for the first time during litigation and was not included in Crothers's termination notice, which only referenced temporary employees working overtime. Crothers also notes that in his email to Emmerich on the day of the strip-and-wax project, January 28, 2024, Arana only recommended that Crothers receive "verbal written counseling" for the unapproved

overtime and floor work she had conducted that weekend. ECF No. ECF No. 37-12, Def.'s Ex. L, at 2. Crothers contends that the "escalation from verbal counseling on January 28 to suspension and eventual termination on February 15—with no new documented triggering event beyond Emmerich's own unverified recommendation—is itself evidence that the stated reasons did not drive the outcome." ECF No. 44 at 17

"A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is substantial." *Securitas Sec. Servs. USA*, 769 F.3d at 613. The changes cited by Crothers are not supported by the record and, in any event, are insubstantial.

Although Crothers's overtime (as opposed to a temporary employee's overtime) was not referenced in Crothers's termination notice, Crothers's own evidence shows that Arana had been concerned about her overtime before her termination. Indeed, the very email on which Crothers relies to show changing rationales—Arana's January 28, 2024 email to Emmerich—referenced Arana's concern that Crothers was "again" working overtime without permission and that Crothers had 191 hours of overtime in the last year. ECF No. 37-12, Def.'s Ex. L, at 2. Crothers also admitted that Arana raised his concern regarding her overtime to her directly during his call with her shortly after her confrontation with Bass. ECF No. 43-3, Crothers Dep. 241:14-24. Crothers's contention that Sodexo came up with this rationale only after she filed suit is thus unfounded.

With respect to Arana's recommendation of only "verbal written counseling" for Crothers's unapproved, weekend overtime work, the escalation of that discipline to full termination was not without foundation, as Crothers alleges. Rather, Crothers admits

that, the day after Arana sent this email, Crothers got into a confrontation with Emmerich regarding the Bass incident, which supported an escalation of discipline. Further, Sodexo did not rely solely on the unapproved overtime and floor work as reasons for termination. It also relied on Crothers's disciplinary history with respect to her treatment of employees. Thus, the escalation of discipline was the result of a cumulation of issues with Crothers's performance. No reasonable jury could conclude that these performance issues, viewed cumulatively, were merely pretext for retaliation for Crothers's single complaint regarding Emmerich's failure to intervene in Cortez's inappropriate conversations weeks before. *See Securitas Sec. Servs. USA*, 769 F.3d at 613 (holding that where the primary reasons for termination have remained consistent, the employer may elaborate on those reasons or articulate additional reasons thereafter).

v. *Similarly Situated Employees*

In a final attempt to demonstrate pretext, Crothers maintains that Sodexo treated similarly situated employees more leniently. Specifically, she points to evidence that Sodexo did not discipline or terminate the following employees: Emmerich or Swoboda for defying Arana's instruction not to bring Bass back to the P&G site[18] and for using Swoboda's badge to do so; Eiland for labeling Crothers "Sodexo Supervisor Bitch" as the contact in his phone; a supervisor, Joe Smith, for chronic attendance problems; and the

---

[18] As Sodexo notes, it appears from the timing of the various emails and contemporaneous records regarding the incident, that Emmerich may not have received Arana's instruction not to bring Bass back onto the site until after he had already done so.

employee who secretly recorded Crothers cursing in the bathroom and sent that recording to Arana.

"A similarly situated coworker is someone who 'dealt with the same supervisor, [was] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" *Cross v. United Parcel Serv., Inc.*, No. 21-3819, 2023 WL 3858611, at *2 (8th Cir. June 7, 2023) (citation omitted). "At the pretext stage, the test for whether someone is similarly situated is rigorous." *Id.*

None of these comparators are alleged to have performed unauthorized work, mistreated subordinates, or engaged in a confrontation with a supervisor that required security invention, as Crothers is alleged to have done. Therefore, Sodexo's failure to discipline these employees is not evidence of pretext.

**Crothers's Alternative Theory of Retaliation**

As noted above, most of Crothers's complaint and briefing describe her protected activity as her complaint about Emmerich's presence during Cortez's sexually inappropriate comments. The Court has concluded that Crothers's complaint about Emmerich in this regard did not constitute protected activity as a matter of law, and that, in any event Crothers cannot not show that Sodexo's proffered reasons for termination were pretext for retaliation based on this complaint.

However, in response to Sodexo's motion for summary judgment, Crothers suggests that her complaint about Cortez's unwanted sexual advances between June and November of 2023, and Cortez's above-noted comments referring to women as "bitches" or describing his sexual activities, also constituted protected activity. Even if the Court

assumed that Crothers's complaints about Cortez could constitute protected activity, Crothers has made no effort to causally connect such complaints to her termination. Rather, Crothers's entire theory of causation rests on Emmerich being upset about Crothers's complaint *about Emmerich* and thereafter orchestrating Crothers's termination. Crothers has offered no argument, let alone evidence, to support a theory that Emmerich or anyone else terminated her in retaliation for her complaint about Cortez's advances or comments.

In short, even viewing the evidence in the light most favorable to Crothers, no reasonable jury could find that Sodexo retaliated against Crothers for engaging in protected activity.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED**. ECF No. 35.

All claims against all parties having been resolved, a separate Judgment will accompany this Memorandum and Order.

Audrey G. Fleissig

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 16th day of September, 2026.